UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

THOMAS MCGILL,

      Petitioner,

v.                                                     Case No. 4:21cv406-WS-HTC

RICKY D. DIXON,

      Respondent.

_____/

<u>REPORT AND RECOMMENDATION</u>

Petitioner Thomas McGill ("McGill"), a prisoner currently incarcerated at Liberty Correctional Institution, has filed a counseled petition under 28 U.S.C. § 2241, challenging the Florida Department of Corrections' (the "FDOC") refusal to apply over 4,000 days of earned gain-time credit to his 50-year sentence as violating the *Ex Post Facto* Clause of the United States Constitution.  After holding an evidentiary hearing and considering the record below as well as the parties' written submissions,[1] the undersigned finds the state courts' summary denial of relief was contrary to, and involved an unreasonable application of, clearly established Federal

---

[1] *See* McGill's Statement of Facts and Memorandum of Law, Doc. 3, the Secretary's Answer, Doc. 16, and McGill's Reply, Doc. 22, and supplement, Doc. 23.

law, as determined by the Supreme Court, as well as an unreasonable misapplication of the facts to the law.  *See* 28 U.S.C. § 2254(d).

The FDOC violated the *ex post facto* prohibition when it changed its interpretation of Florida's Gain-Time Statute, Fla. Stat. § 944.275 (1994), as well as its implementing regulation, Fla. Admin. Code r. 33-11.0065, in 2016 and retrospectively applied that changed interpretation to extend the time McGill will be incarcerated.  The state courts' determination to the contrary is objectively unreasonable, particularly in light of the evidence presented to the courts below, which included (1) evidence that until at least 2016, the FDOC applied earned gain-time credit to reduce the sentences of inmates, like McGill, who committed capital offenses between January 1, 1994, and September 30, 1995, and (2) evidence that the FDOC tracked and posted gain-time credit for McGill from the time he was incarcerated in 1994 until 2016.  Thus, the petition should be GRANTED and the Secretary be directed to apply all accrued gain-time credits to McGill's sentence.

## I.    BACKGROUND FACTS AND PROCEDURAL HISTORY

McGill committed the capital offense of first-degree murder in December 1994, when he was 17 years old.  *See* Bay County Case No.:  95-CF-111.  He was

charged as an adult, convicted in 1996, and originally sentenced to a mandatory life sentence.[2]  Doc. 16-1 at 5.

In 1994, the FDOC had a regulation regarding the computation of gain-time, which contained the following pertinent provision:

> Death or Life sentences cannot be reduced by gain-time.  However, any inmate serving a death or life sentence will be considered for incentive gain-time and the gain-time will be posted so that in the event the life or death sentence is commuted to a number of years, the accumulated incentive gain-time will be applied to the inmate's sentence.

Fla. Admin. Code r. 33-11.0065 (1994) (hereinafter the "1994 Rule") (re-numbered in September 1998 as 33-601.101.)

The authorizing statute for the 1994 Rule was Florida's Gain-Time Statute, Fla. Stat. § 944.275, which in December 1994 contained the following two subsections regarding incentive gain-time:

> For each month in which a prisoner works diligently, participates in training, uses time constructively, or otherwise engages in positive activities, the department may grant up to 20 days of incentive gain-time, which shall be credited and applied monthly.

Fla. Stat. § 944.275(4)(b) (1994).

> For each month in which a prisoner works diligently, participates in training, uses time constructively, or otherwise engages in positive activities, the departments may grant incentive gain-time in accordance with this paragraph. For sentences imposed for offenses committed on or after January 1, 1994, for offenses which are, were, or would have been ranked on the offense severity chart in s. 921.0012 in:

---

[2] McGill was also charged with robbery with a firearm (count II) and sentenced to 153.7 months, which he has already served.  Therefore, that sentence has no effect on the instant analysis.

1.  Levels 1 through 7, up to 25 days of incentive gain-time, which shall be credited and applied monthly.

2.  Levels 8, 9, and 10, up to 20 days of incentive gain-time, which shall be credited and applied monthly.

Fla. Stat. § 944.275(4)(c) (1994); *see* CRIMINAL JUSTICE AND CORRECTIONS—GENERAL AMENDMENTS, 1993 Fla. Sess. Law Serv. ch. 93-406 (S.B. 26–B) (WEST).

Pursuant to the 1994 Rule and the 1994 Gain-Time Statute, the FDOC tracked gain-time for all inmates sentenced to life because of the potential those life sentences could be commuted to a term of years. *See e.g., John v. Crews*, 149 So. 3d 149, 151 (Fla. 1st DCA 2014); *Walker v. Fla. Dep't of Corr.*, 5:15-cv-25-MW/EMT, 2016 WL 1426011, at *2 (N.D. Fla. Mar. 18, 2016). The FDOC would send monthly printouts to inmates, including to McGill, showing the amount of gain-time credit the inmate earned. Doc. 22-1 at 4-25. As of February 11, 2016, McGill had earned 4,148 days of gain-time credit. Doc. 22-1 at 37. McGill testified he had been working to earn gain-time "from the first day in the Department of Corrections" "all in hopes of one day getting the life sentence off."[3]  Doc. 28 at 67. And, as

---

[3] McGill further testified he was told "[f]rom day one, from the first day in the Department" by classification, the warden, and everyone else that "there's life, if you get that life sentence off all this gain time you accrue will be applied, be good, do the right thing, get your vocationals, do everything you can to get yourself out here because one day you might have that opportunity." Doc. 28 at 67.

discussed below, in 2017, McGill's life sentence was, in fact, subsequently reduced to a term of years.

On April 20, 2015, after the United States Supreme Court's decision in *Miller v. Alabama*, 567 U.S. 460 (2012),[4] McGill filed a motion seeking a resentencing hearing, which motion was granted. In February 2016, while preparing for the hearing, McGill's counsel, Sonya Rudenstine, asked the FDOC how much gain-time would be applied to McGill's sentence if the state court was to reduce the sentence to a term of years. Doc. 22-1 at 63-65; Doc. 28 at 81.

In response to Rudenstine's inquiry, the FDOC's Correctional Services Consultant, Stacey Haynes, advised that the FDOC did not intend to apply any of the 4,148 days of earned gain-time to McGill's sentence, regardless of whether it was converted to a term of years. Doc. 22-1 at 64-66. According to Haynes, while the FDOC had been calculating and posting gain-time for McGill since his incarceration, it did so "solely for record keeping purposes." *Id.* Haynes explained that the FDOC's interpretation of the version of Fla. Stat. § 944.275 in effect in December 1994, when McGill committed the murder, was that "capital crimes are not included within the guidelines sentencing scheme" providing for gain-time, so,

---

[4] In *Miller*, the Court held that a mandatory sentence of life without parole for juveniles, even in homicide cases, is unconstitutional. The *Miller* decision was a logical extension of the Supreme Court's decisions in *Roper v. Simmons*, 543 U.S. 551 (2005) and *Graham v. Florida*, 560 U.S. 48 (2010). *See Montgomery v. Louisiana*, 577 U.S. 190, 206 (2016) (the "'foundation stone' for *Miller*'s analysis was this Court's line of precedent holding certain punishments disproportionate when applied to juveniles").

"[f]or term-of-year sentences imposed for capital crimes committed 1/1/94 to 9/30/95, no gain-time is authorized."[5]  *Id.*  In other words, while other inmates who had their life sentences reduced qualified for accumulated gain-time credit, McGill did not because his offense occurred between January 1, 1994, and September 30, 1995.

After exhausting his administrative remedies, McGill filed a petition for writ of mandamus in the Second Judicial Circuit in Leon County (Case No.: 18-CA-2011), Doc. 16-6 at 2-66, and a petition for certiorari review with the First District Court of Appeals ("First DCA"), arguing the FDOC changed its interpretation of the 1994 Rule in 2016, and its retrospective application of the changed interpretation to him violated the *ex post facto* prohibition.  The state courts denied relief.  In the interim, McGill had his re-sentencing hearing and, in June 2017, the circuit court resentenced McGill to a term of fifty (50) years, less 473 days jail credit as previously awarded, and credit for time already served in prison.[6]  Doc. 16-2 at 12.

---

[5] As will be discussed below, despite admitting the 1994 Gain-Time Statute applies to McGill, Haynes quoted from the 1995 version of § 944.275, which was *not* the version in effect at the time of McGill's offense.

[6] Later, the judgment and sentence were amended to reflect that McGill is entitled to a review of his sentence after twenty-five years pursuant to Fla. Stat. § 921.1402.  Doc. 16-5 at 1.  A judicial review hearing was held in December 2021, and the circuit court declined to further reduce McGill's sentence.

McGill filed the instant federal habeas petition with this Court on October 5, 2021,[7] raising the following single issue:

> Whether the State's retrospective application of a changed interpretation of whether prisoners originally sentenced to life imprisonment could be awarded gain-time after they had their sentences changed to term-of-years sentences violated the *ex post facto* clause of the United States Constitution, *see* Art. I, § 9, cl. 3, U.S. Const.; Art. I, § 10, cl. 1., U.S. Const.

After reviewing the petition and the Secretary's response, the undersigned set the matter for an evidentiary hearing, which was held on December 8, 2023. Rudenstine and McGill testified at the hearing on behalf of McGill, and two FDOC employees, Michelle Palmer and Robert Lee Adams, testified for the Secretary. After the hearing, the undersigned allowed the parties to submit supplemental briefs, which they did. *See* Docs. 32, 33.[8]

## II.   AEDPA STANDARD

The Antiterrorism and Effective Death Penalty Act ("AEDPA") governs a state prisoner's attack on the execution of his sentence. *See Gaines v. Att'y Gen., Fla.*, 788 F. App'x 623, 627 (11th Cir. 2019) (citing *Medberry v. Crosby*, 351 F.3d 1049, 1062 (11th Cir. 2003)). Under the AEDPA, relief may only be granted on a

---

[7] There is no dispute the petition is timely filed as the First DCA issued its mandate on January 20, 2021. *See* 28 U.S.C. § 2244(d)(1). Also, although McGill filed the federal petition as a petition under § 2254, the Court converted it to one falling under § 2241.

[8] The Court allowed the parties to submit supplemental briefing, to include addressing the following issues (1) whether the 1994 version of § 944.275 is ambiguous and (2) whether the matter should be remanded, stayed, dismissed, or decided on the merits. Doc. 27 at 2.

claim adjudicated on the merits in state court if the adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d)(1)-(2).

A decision is "contrary to" clearly established federal law if the state court either: (1) applied a rule that contradicts the governing law set forth by Supreme Court case law; or (2) reached a different result from the Supreme Court when faced with materially indistinguishable facts. *Ward v. Hall*, 592 F.3d 1144, 1155 (11th Cir. 2010); *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003). A state court decision involves an "unreasonable application" of Supreme Court precedent if the state court correctly identifies the governing legal principle, but applies it to the facts of the petitioner's case in an objectively unreasonable manner, *Brown v. Payton*, 544 U.S. 133, 134 (2005), or "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply," *Bottoson v. Moore*, 234 F.3d 526, 531 (11th Cir. 2000) (quoting *Williams v. Taylor*, 529 U.S. 362, 406 (2000)).

## III.   *EX POST FACTO* PROHIBITION

As stated above, the sole issue presented in this petition is whether the FDOC violated the prohibition on *ex post facto* laws when it refused to apply earned gain-time to McGill's 50-year sentence.  "Bills of attainder, ex-post facto laws, and laws impairing the obligation of contracts, are contrary to the first principles of the social compact, and to every principle in sound legislation."  The Federalist Papers No. 44. Thus, Congress and the States are prohibited from enacting any law "which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed."  *Weaver v. Graham*, 450 U.S. 24, 28 (1981) (quoting *Cummings v. Missouri*, 4 Wall. 277, 325–326, 18 L. Ed. 356 (1867)).

"An *ex post facto* law is one which renders an act punishable in a manner in which it was not punishable when it was committed."[9]  *Fletcher v. Peck*, 6 Cranch 87, 138, 3 L. Ed. 162 (1810) (citing *Calder v. Bull*, 3 U.S. 386 (1798)).  This *ex post facto* prohibition applies equally to laws that increase a penalty as well as ones which create a new crime.  *See Calder*, 3 U.S. at 397 ("The enhancement of a crime, or penalty, seems to come within the same mischief as the creation of a crime or

---

[9] The prohibition against *ex post facto* law-making is found in two places in the U.S. Constitution, Art. I, § 9, cl. 3 ("No Bill of Attainder or ex post facto Law shall be passed") and Art. I, § 10 ("No State shall ... pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts").

penalty" after the fact.).  At the heart of the *ex post facto* prohibition is the duty to provide notice and fair warning.  *Weaver*, 450 U.S. at 29 ("Through this prohibition, the Framers sought to assure that legislative Acts give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed.").

A change in an agency's interpretation of an ambiguous statute, when applied retrospectively, may also violate the *ex post facto* prohibition.  *See Knuck v. Wainwright*, 759 F.2d 856, 858-59 (11th Cir. 1985).  However, the *ex post facto* prohibition is not violated if the agency "corrects an erroneous interpretation (even if the error was a reasonable one) … of a clear pre-existing statute."  *Metheny v. Hammonds*, 216 F.3d 1307, 1310 (11th Cir. 2000) (holding that the retroactive application of a new parole regulation to correct a prior erroneous interpretation of a duly-enacted statute cannot support an *ex post facto* claim) (collecting cases).

Thus, to prevail on an *ex post facto* claim, McGill must demonstrate (1) a change in the law or an interpretation of the law was retrospective, in that it was applied to events occurring before its enactment, and (2) he was disadvantaged by it.  *United States v. Abraham*, 386 F.3d 1033, 1037 (11th Cir. 2004), *cert. denied*, 546 U.S. 934 (2005).

## IV.    DISCUSSION

Although neither the Gain-Time Statute nor the 1994 Rule was amended in 2016, McGill argues the FDOC's interpretation of both changed at that time.

Specifically, McGill argues that prior to 2016, the FDOC applied earned gain-time credit to capital offender inmates who had their life sentences reduced to a term regardless of when the offense occurred. However, in 2016, the FDOC changed its interpretation of the statute and regulation to exclude those capital offender inmates who committed a crime between January 1, 1994, and September 30, 1995, from being eligible for gain-time credit on a commuted life sentence.

The Secretary, on the other hand, disputes the FDOC changed its interpretation of either the Gain-Time Statute or the 1994 Rule. Instead, the FDOC argues that, to the extent the FDOC granted gain-time credit to inmates like McGill who committed capital offenses between January 1, 1994, and September 30, 1995, it did so in "error" because it is prohibited by the Gain-Time Statute from granting gain-time to those inmates.

In the circuit court's written opinion, the court concluded there was no *ex post facto* violation for two reasons. First, McGill had not been awarded any gain-time and, thus, none had been taken away from him. Doc. 22-4 at 14. Second, "the Department is enforcing the very gain-time statutes in effect at the time Petitioner committed his offense, not some later statutes or regulations which have put him in a detrimental position." *Id.* The undersigned finds that no reasonable interpretation of the record evidence or the law supports either conclusion.

**A.    Did the FDOC Change Either Its Interpretation of the Florida Gain-Time Statute or the 1994 Rule in 2016?**

To determine whether McGill is entitled to relief, the first question for this Court to answer is whether the FDOC changed its interpretation of either Fla. Stat. § 944.275 (1994) or the 1994 Rule in 2016.  Based on the evidence presented, the answer to that question is "yes."  The evidence clearly shows that (1) prior to 2016, the FDOC reduced the sentences of inmates, just like McGill, who had committed a capital offense between January 1, 1994, and September 30, 1995, by granting those inmates gain-time credit and (2) after 2016, the FDOC removed earned gain-time credits from those inmates' records.

According to Michelle Palmer, the FDOC's Chief of the Bureau of Admission and Release, prior to 2016, the FDOC tracked and posted gain-time for *all* prisoners, regardless of the severity of the offense or offense date.  Doc. 28 at 108-09.  The FDOC did this pursuant to the 1994 Rule because a prisoner's life or death *sentence* could be reduced to a term of years.  *Id.*; Fla. Admin. Code r. 33-11.0065 (1994).  Thus, for more than 20 years the FDOC tracked and posted McGill's gain-time, at a rate of up to 20 days per month, and sent him monthly notices showing him how much gain-time had accrued for each month.  Doc. 28 at 102.  As of February 2016, McGill had earned 4,148 days of gain-time.

Not only did the FDOC track and post earned gain-time for *all* prisoners, regardless of offense date or offense type, but the FDOC "applied" earned gain-time

to reduce the sentences of "some inmates originally sentenced to capital offense and then term of years," even though, like McGill, they had committed their capital offense between January 1, 1994, and September 30, 1995.  Doc. 28 at 99.  In other words, those inmates "received the awards" of gain-time credit.  Doc. 28 at 111-12 ("I can testify that they received the awards.").  Indeed, prior to 2016, based on those gain-time awards, the FDOC released at least three inmates who had committed capital offenses between January 1, 1994, and September 30, 1995.

So, what happened in 2016 to change the way the FDOC handled gain-time credit for inmates who committed a capital offense between those dates – an inmate named Kenneth Purdy was released.  According to Palmer, in late 2015 or early 2016, the FDOC received a call from the State Attorney's Office after it released Purdy, who like McGill was an inmate resentenced under *Miller*.  Purdy filed his post-conviction motion seeking resentencing in May 2015, and in November 2015, the court resentenced him to 40 years for the murder conviction.[10]  The following month, the court conducted a sentence review hearing for Purdy and modified his sentence for his murder conviction to time served (Purdy had been in custody for 20

---

[10] Purdy's initial resentencing resulted in several appeals and remands, most of which were on issues unrelated to the issues here except for one issue.  Like the circuit court did in McGill's case, the circuit court in Purdy's case stated in the resentencing order that Purdy was not eligible for gain-time.  *Id.  However*, on appeal, the appellate court concluded that the trial court did not have the authority to regulate gain-time – as that authority resides exclusively with the FDOC.  Thus, the court remanded the case to the circuit court to "strike as surplusage any language in the sentencing documents regarding gain-time."  *Purdy v. State*, 257 So. 3d 567, 568 (Fla. 5th DCA 2018).

years, 6 months and 13 days). *See Purdy v. State*, 268 So. 3d 813, 814-16 (Fla. 5th

DCA 2017) (for history of the case), *decision quashed*, 252 So. 3d 723 (Fla. 2018).

Purdy, however, also had a 112.7-month sentence for armed robbery and armed

carjacking which was to run consecutive to his sentence for murder. *Id.*

On December 21, 2015, after applying Purdy's earned gain-time to his

remaining sentence, the FDOC determined he was eligible for release. Doc. 22-2 at

4. A mere two days later, however, the FDOC rearrested Purdy, contending it had

miscalculated Purdy's release date by including earned gain-time. *Id.* Palmer

testified that the State Attorney told the FDOC capital felonies "during that time

frame were ineligible." Doc. 28 at 109-10. Purdy's offense fell between January 1,

1994, and September 30, 1995.

The State Attorney's call resulted in the FDOC reviewing the Gain-Time

Statute and asking its general counsel to review the statute. *Id.* at 110. After

reviewing the Gain-Time Statute, the FDOC determined the statute "did not provide

eligibility for that group" of inmates – that group being offenders who committed a

capital offense between January 1, 1994, and September 30, 1995, and whose

sentences were reduced to a term of years. *Id.* at 104. The FDOC then searched its

database going back "20 years or so" for any inmate who had committed a capital

offense between January 1, 1994, and September 30, 1995, and who had "earned

gain time," and identified nine inmates. *Id.* at 99-100. Four of the nine inmates were

still in custody and at least three inmates had been released based on the application of earned gain-time.  *Id.*; Doc. 31.  Those released inmates, like Purdy and McGill, committed capital offenses between January 1, 1994, and September 30, 1995.  At least two of those inmates were released in **2013**.[11]

One of those released inmates was Derrick Powell.  Doc. 31.  Powell's life sentence was reduced to 25 years in 2013 under *Miller*, and after applying gain-time credit to his sentence, the FDOC released him.  Another inmate was Paul Clayton. *Id.*  The FDOC released Clayton in 2013, after applying gain-time credit to his 25-year sentence.  Although the FDOC contends the release of both Powell and Clayton was in error, the FDOC issued a warrant for Clayton and brought him back into custody in 2016; they did not issue a warrant for Powell.

Not only did the FDOC grant gain-time to the inmates who were released, it also applied earned gain-time credit to the inmates who remained in custody.  Doc. 28 at 113 (Q. "did it reflect that gain time as having been earned?  A. "Yes, that's – yes, all of them").  However, after 2016, the FDOC "removed" the earned gain-time from those inmates' records.  *Id.* at 116.

---

[11] Although Palmer testified four of the nine inmates identified in the database search were still in custody and three had been released, it is unclear whether she was including Purdy and McGill in her testimony.  Doc. 28 at 99-100.  Regardless, neither Palmer's testimony nor any other evidence indicates the FDOC considered any of the nine inmates ineligible for gain-time before the 2016 policy change.

McGill submitted evidence of the FDOC's application or award of gain-time credit to reduce Clayton, Purdy, and Powell's sentences to the circuit court, but the circuit court failed to address this evidence in its order denying relief. Instead, despite this evidence, the circuit court concluded the FDOC had not changed its method of calculating gain-time and had not applied a new interpretation of a statute after a long period of applying a different interpretation. Doc. 22-4 at 14. The circuit court's determination is objectively unreasonable and contrary to the evidence presented. No reasonable jurist would find otherwise.

After 2016, the FDOC also changed how it recorded gain-time for inmates such as McGill under the 1994 Rule. According to Robert Lee Adams, an FDOC correctional program consultant who served as the FDOC's Chief of the Bureau of Admission and Release from 2012 to 2019 (prior to Palmer taking over that role), the FDOC put a new "code" in its "database" to change the recording of gain-time for "this particular group of inmates" (inmates who committed capital offenses between January 1, 1994, and September 30, 1995). Doc. 28 at 124. Consistent with Palmer's testimony, Adams testified the change occurred when the FDOC was told by the general counsel's office that the "statute did not authorize this particular group of inmates to have gain time." *Id.* Under this new "code," even though the "gain time record is still there," the code "prevented [the gain-time] from showing up on the calculator at all." *Id.*

Although Adams did not testify before the circuit court (as the court did not hold an evidentiary hearing), McGill's counsel, Rudenstine, submitted an affidavit to the circuit court, in which she stated that she was advised by the FDOC that it was in the process of "removing gain-time from the classification records of various juveniles, including Mr. McGill, because the Department had recently changed its interpretation," and that while McGill's "gain-time would be backed up on the Department's computer system," it "would no longer be reflected in his classification file." Doc. 22-6 at 109. The circuit court's written opinion, however, makes no reference to this evidence. Moreover, while the Secretary contends McGill puts too much emphasis on a bad word choice by FDOC staff – the use of the word "removed," Haynes was not the only staff member who used that term. As McGill points out, in 2018, in response to a grievance, another FDOC official advised McGill that "all gain time has been **removed**." Doc. 22-6 at 116 (emphasis added).

The FDOC also subsequently amended the 1994 Rule to reflect its revised interpretation of the Gain-Time Statute. The new rule, which became effective August 10, 2022, contains a provision making any inmate "serving a sentence for a capital offense committed on or after January 1, 1994, and before October 1, 1995" ineligible to "receive or accumulate gain time." *See* Notice of Proposed Rule Making, F.A.R. Vol. 48/105 (May 31, 2022); Final Rule 33-601.101 (2022). According to Adams, the FDOC amended the 1994 Rule to "reflect" the Gain-Time

Statute. Doc. 28 at 121; *see also id.* at 134 (explaining that after *Miller* was decided, the FDOC "felt like we needed to make it explicit and clarify in the rule that for these inmates [(i.e., those youthful offenders convicted of a capital offense committed between January 1, 1994, and September 30, 1995)] you're still not eligible for the gain time"). In other words, because the 1994 Rule always provided the possibility that gain-time could be applied if a life or death sentence was commuted to a term of years *regardless* of the date of the offense, the 1994 Rule was amended after 2016 to carve out an exception for offenses committed between 1994 and 1995.[12] Doc. 28 at 134-35.

The FDOC argues its application of gain-time credit to the nine inmates discussed above who committed capital offenses between 1994 and 1995 was an "error," and so undoing that application was not a change in policy but a correction of an error. There is, however, no evidence to support that argument. There is no evidence the FDOC ever considered denying these inmates gain-time before the 2016 policy change. Indeed, all the evidence, including the evidence regarding the release of Purdy, Powell, and Clayton and how gain-time was tracked, indicates the FDOC believed gain-time could be applied to inmates who committed capital

---

[12] Specifically, the FDOC withdrew the 1994 Rule on June 5, 2018, *see* F.A.R. Vol. 44/109 (June 5, 2018), and promulgated a new rule "to amend the rule as it relates to gain-time eligibility for inmates sentenced for a capital offense committed on or after January 1, 1994, and before October 1, 1995, so that the rule is consistent with section 944.275, F.S." *See* Development, F.A.R. Vol. 48/68 (April 7, 2022).

offenses between January 1, 1994, and September 30, 1995, so long as the inmate was serving a term of years.

Finally, while the reason the FDOC changed its interpretation of the Gain-Time statute is not necessarily relevant, it appears the State Attorney as well as the FDOC's general counsel were relying on the **wrong** version of the Gain-Time Statute in 2016. Notably, in the FDOC's explanation to McGill regarding why he was no longer eligible for gain-time credit, the FDOC quoted from the 1995 version of the statute, which as discussed below, did not go into effect until October 1, 1995. Doc. 22-1 at 37; Doc. 22-6 at 86; 22-6 at 144. Similarly, when the FDOC decided to re-arrest Clayton, it also quoted from the 1995 version as the basis for doing so. Doc. 22-1 at 22. Thus, as discussed next, if there was any "error" made by the FDOC, it was not in how it contemporaneously interpretated the statute, but in its later changed interpretation.

## B.    Did the FDOC's Changed Interpretation Disadvantage McGill?

Because it is clear the FDOC changed its interpretation of the 1994 Gain-Time Statute and the 1994 Rule, the next question for the Court to answer is whether the FDOC retrospectively applied that change to McGill in a way that disadvantaged him. The answer to that question is also "yes."

Prior to 2016, McGill, like all other inmates, received statements showing the amount of gain-time credit he had earned for each month, Doc. 22-1 at 4-25, and

when he requested information regarding the gain-time credits he had earned, the FDOC responded by advising him the number of days he had earned for each month, including that he had earned 60 days for getting his GED. Doc. 26-5 at 1-2. The notices were provided to ensure that once a life sentence was reduced to a term of years, the FDOC would apply any accrued gain-time to the term sentence. Doc. 28 at 129-30.

After 2016, however, the FDOC's response to the same inquiry from McGill was that "all gain time has been removed."[13] Doc. 26-5 at 3. In fact, in April 2021, FDOC records showed McGill had "-90" gain-time because the calculator did not show "any of that other gain-time."[14] *Id*.; *see also* Doc. 22-1 at 28. The FDOC's retrospective application of its changed interpretation of the Gain-Time Statute and the 1994 Rule to McGill in 2016 clearly disadvantaged him. Without the application of earned gain-time, McGill's current tentative release date is December 13, 2044. If McGill is allowed the benefit of the gain-time he earned, McGill's sentence will be reduced by more than 10 years. Thus, by removing the gain-time credit McGill

---

[13] Prior to the written inquiry, McGill reached out to his classification officer to find out how much gain-time he had accrued. The officer, Ms. Bass, called McGill into her office and while looking at her computer screen told McGill it appeared as if all the gain-time had been deleted from his classification file; she also told him "she had never seen anything like that, that she couldn't figure it out." Doc. 28 at 75-77. Ms. Bass directed McGill to start grieving the removal, which he did through the subsequent written requests.

[14] During the 22 years the FDOC recorded gain-time for McGill, he had 7 disciplinary reports, but only one – for spoken threats, resulted in the loss of any gain-time. This occurred in 1998 and resulted in the 90 days noted above. Doc. 22-1 at 28.

had earned for more than 20 years, the FDOC has extended the time McGill will be incarcerated.  Indeed, at a rate of 20 days of gain-time per month for good behavior, McGill could have accrued or earned an additional 240 days a year since 2016, or over 1,400 more days up through 2023.

Nonetheless, the FDOC argues because it never "awarded" gain-time credit to McGill, he has not been disadvantaged because none was taken away from him. According to the FDOC, it merely "calculated *potentially available* gain-time" for McGill.  Doc. 16 at 11.  While the circuit court agreed with this argument, it has been rejected by the Supreme Court.  Notably, in *Weaver*, the Supreme Court held that by retroactively decreasing the amount of gain-time an inmate was eligible to receive based on good behavior, the FDOC violated the *Ex Post Facto* Clause regardless of whether any gain-time was taken away.  450 U.S. at 36.  As the Court explained, it was irrelevant that the "new statute did not withdraw any credits already awarded to Weaver," as the new statute nonetheless made the punishment for crimes committed before its enactment "more onerous" by "curtailing the availability of future credits," which "effectively postponed the date when [Weaver] would be eligible for early release."  *Lynce v. Mathis*, 519 U.S. 433, 442 (1997) (explaining *Weaver*).

The same is true here.  By refusing to reduce McGill's sentence by the more than 4,000 days of gain-time credit for him and removing that earned credit from the

"calculator," the FDOC curtailed the availability of future credits and postponed the date McGill would otherwise be eligible for release by more than 10 years.  The FDOC has, thus, run "afoul of the prohibition against *ex post facto* laws."  *See id.; see also Britt v. Chiles*, 704 So. 2d 1046 (Fla. 1997) (retrospective application of new statute which made revocation of future gain-time credit mandatory rather than discretionary violated the *ex post facto* prohibition).

### C.  Does Fla. Stat. § 944.275 (1994) Prohibit the FDOC From Granting Gain-Time Credit to McGill?

The Secretary also argues that regardless of what the 1994 Rule may provide, the Secretary is not authorized to grant gain-time to McGill because the Gain-Time Statute prohibits it from doing so.  As McGill pointed out in his state court petition, the Secretary's position here is like the one it took in *Knuck*, when the FDOC retrospectively applied a new rule of calculating gain-time monthly to Knuck, causing him to lose a year of gain-time.

In *Knuck* the Secretary argued that the policy in effect at the time of the offense, which provided that gain-time be awarded in a lump sum, was contrary to Fla. Stat. § 944.27 and, thus, the FDOC's "change in calculation was not a change in the law."  *Knuck*, 759 F.2d at 858.  The Eleventh Circuit rejected the Secretary's explanation and held, instead, that the FDOC's new method of calculating gain-time, when applied retrospectively to Knuck, violated the *ex post facto* prohibition because the statute was "sufficiently ambiguous that it reasonably could have been

interpreted as the D.O.C. did interpret it for over 10 years to provide for lump sum awarding of gain time." *Id.* Thus, under *Knuck*, the circuit court should have answered two questions before deciding there was no *ex post facto* violation. First, the circuit court should have determined whether Fla. Stat. § 944.275 (1994) was ambiguous. And, if it is, then the circuit court should have determined whether the Secretary's contemporaneous interpretation of the statute -- that is, the interpretation it had up until 2016 -- was a reasonable interpretation of Fla. Stat. § 944.275 (1994).

The circuit court, however, engaged in neither of those analyses. Instead, in one line, the circuit court simply concluded that under the Gain-Time Statute "first degree murderers are ineligible to earn" gain-time because the legislature did not, but could have, stated they could when their sentences were reduced to a term of years. Doc. 22-4 at 11. The circuit court's conclusion is objectively unreasonable and contrary to law because there is no prohibition in the statute on first degree murderers receiving gain-time. Even the Secretary is not arguing for such an interpretation here – instead, he is only trying to limit the application of gain-time credit for first degree murderers who committed offenses between January 1, 1994, and September 30, 1995.

Since 1983, Florida's Gain-Time Statute has undergone several amendments. As relevant to this case, the Gain-Time Statute was amended, effective January 1, 1994, as part of the "Safe Streets Initiative of 1994," which, among other things,

eliminated basic gain-time. *See Pollock v. Sec'y, Fla. Dept. of Corr.*, 349 F. App'x 383, 385 n.1 (11th Cir. 2009); *Strader v. Sec'y, Dept of Corr.*, 2023 WL 3976157 at *1 (M.D. Fla. June 13, 2023).  The 1994 version of the statute remained in effect until October 1, 1995, and is the version applicable to McGill since his offense occurred in December 1994.  *See Edwards v. Jones*, No. 3:16CV060-MCR/CAS, 2017 WL 4782826, at *2 (N.D. Fla. Sept. 27, 2017), *report and recommendation adopted*, No. 3:16CV60-MCR/CAS, 2017 WL 4782652 (N.D. Fla. Oct. 23, 2017) ("an inmate is entitled to gain time only in accordance with the law in effect at the time of the inmate's offense") (citing *Waldrup v. Dugger*, 562 So. 2d 687 (Fla. 1990)).

As stated at the outset, the 1994 version contained two relevant parts covering incentive gain-time - subsection 4(b) and subsection 4(c).  Under subsection 4(b), the FDOC may grant up to 20 days of gain-time credit to all inmates regardless of when the offense occurred or the severity of the offense.  Under subsection 4(c), however, if the offense was committed after January 1, 1994 and the offense was or would have been ranked on the offense severity chart, the FDOC may grant up to 25 days of gain-time for inmates who committed offenses at severity levels 1-7, and up to 20 days of gain-time credit for inmates who committed offenses at severity levels 8-10.  Contrary to the Secretary's position, these two subsections, when read together, make Fla. Stat. § 944.275 (1994) ambiguous because the statute is

reasonably susceptible to more than one interpretation. *See, e.g.*, *Kasischke v. State*, 991 So. 2d 803, 807 (Fla. 2008).

One reasonable interpretation is the one proffered by McGill (and also the FDOC's contemporaneous interpretation), which is that, under subsection 4(b), the FDOC may grant gain-time to all prisoners, including those who committed capital offenses, and subsection 4(c) allows the FDOC to award a greater amount, 25 days, to prisoners whose offenses were committed after January 1, 1994 (the effective date of the amendment) and included in the offense severity chart, and were less severe. This interpretation is certainly reasonable.

The Secretary argues McGill's interpretation makes subsection 4(c)2. superfluous; it does not. Subsection 4(c)2 is consistent with subsection 4(b) in that it makes clear the most gain-time prisoners with higher offense levels could earn is 20 days.[15]

The Secretary, thus, offers a different interpretation, which is that subsection 4(b) does not apply to McGill because subsection 4(c) specifically addresses offenses occurring after January 1, 1994. Doc. 33 at 22. While that interpretation is arguably reasonable, it is contrary to the canons of statutory construction. If the

---

[15] In other words, subsection (c) applies to offenses which: (1) were committed on or after January 1, 1994; and (2) are ranked on the offense severity chart. And subsection (b) applies to all offenses committed before January 1, 1994, and those offenses committed on or after January 1, 1994, which are not ranked on the offense severity chart.

legislature intended for subsection 4(b) to apply only to those offenses committed prior to January 1, 1994, as the Secretary posits, it could have easily stated so. *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("[w]here [the legislature] includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that [the legislature] acts intentionally and purposely in the disparate inclusion or exclusion"); *Leftwich v. Fla. Dep't of Corr.*, 148 So.3d 79, 87 (Fla. 2014) ("All statutory provisions must be given their full effect by the courts, and related statutory provisions must be construed in harmony with one another.") (citation omitted).

When a statute's language is ambiguous, the court should look to the rules of statutory construction to help interpret legislative intent, which may include an examination of the statute's legislative history. *Hardee Cnty. v. FINR II, Inc.*, 221 So. 3d 1162, 1165 (Fla. 2017). The Secretary argues the legislative history for the Gain-Time Statute shows the legislature intended to exclude prisoners who committed capital offenses between January 1, 1994, and September 30, 1995, from earning gain-time credit.[16] The undersigned discerns no such intent from the legislative history.

---

[16] Although the Secretary argues the statute is unambiguous, he also suggests the Court should look to the legislative history of not only the 1994 Version, but the later versions to decipher the legislature's intent. While "the polestar of statutory interpretation is legislative intent," that intent must be determined "by first looking at the actual language used in the statute." *Searcy, Denney,*

Instead, what the legislative history shows is that the legislature over the course of time, depending on the social and moral concerns at the time (i.e., prison overcrowding, etc.) has amended the statute to adjust the amount of gain-time that can be earned. There is nothing in the history indicating that the legislature intended to exclude capital offenders, much less a minute group of capital offenders, from earning gain-time if their sentence was commuted to a term of years. To the contrary, if the legislature had such an intent, it could have simply added a date qualifier to subsection 4(b) when it amended the statute in 1994, just as it did to subsection 4(c) **and s**ubsection 6(a).[17] *See, e.g.*, *Nikolits v. Nicosia*, 682 So. 2d 663, 665 (Fla. 4th DCA 1996) ("When the legislature has carefully employed a term in one section of a statute, but omits it in another section of the same act, it should not be implied where it is excluded."); *Russello*, 464 U.S. at 23. Nowhere in the circuit court's opinion does the court discuss subsection 4(b) or its interaction with subsection 4(c).

---

*Scarola, Barnhart & Shipley v. State*, 209 So.3d 1181, 1189 (Fla. 2017) ("If the statutory language is clear and unambiguous, the court may not resort to the rules of statutory construction and the statute must be given its plain and obvious meaning."). Thus, if the statute is unambiguous, as the Secretary suggests, then the Court must interpret the legislative intent based on the plain language of the statute. *Id.*

[17] One of the purposes of the 1994 amendments was to eliminate basic gain-time. Thus, when the legislature amended the statute, it made clear that basic gain-time would be provided to only those inmates who committed offenses "after July 1, 1978, and before January 1, 1994." Fla. Stat. § 944.275(6)(a) (1994). The legislature could have easily inserted that same language in subsection 4(b) and its failure to do so indicates the legislature did not intend for any such limitation to apply.

The legislature amended the Gain-Time Statute again in 1995, as part of the Crime Control Act of 1995, *see* Laws of Florida, ch. 95-184, and the "Stop Turning Out Prisoners Act." *See* ch. 95-294, § 2 at 2717-18 Laws of Fla; *see also Duer v. Moore*, 765 So. 2d 743, 744 (Fla. 1st DCA 2000); CRIMES—JUSTICE SYSTEM— GENERAL AMENDMENTS, 1995 Fla. Sess. Law Serv. Ch. 95-184 (C.S.S.B. 172) (WEST); Committee Substitute for House Bill No. 687, Chapter 95-294.   Among other changes, the amendments combined subsections (4)(b) and (4)(c) into one section.  The Secretary argues the 1995 version of the Gain-Time Statute "clarifies" the 1994 version by making it clear that subsection 4(b) was intended to apply only to inmates who committed offenses prior to January 1, 1994.[18]  Doc. 33 at 12-13, 43-47.  The undersigned disagrees.

The primary purpose of the 1995 amendments was to modify the Gain-Time statute to ensure that all inmates serve at least 85% of their imposed sentences.  *See* ch. 95-294, § 2 at 2717-18 Laws of Fla; *see also Duer*, 765 So. 2d at 744; CRIMES— JUSTICE SYSTEM—GENERAL AMENDMENTS, 1995 Fla. Sess. Law Serv. Ch. 95-184 (C.S.S.B. 172) (WEST); Committee Substitute for House Bill No. 687, Chapter 95-294.  The amendments represented Florida's response to the Truth in

---

[18] The argument that the 1995 version of the Gain-Time Statute was needed to "clarify" the 1994 version could be seen as an acknowledgement that the 1994 version is ambiguous.  *See Knuck*, 759 F.2d at 859 (noting "[t]he legislature itself may have recognized the ambiguity of the statute because it amended Section 944.27 in 1976 to indicate that the gain time should be awarded 'on a monthly basis as earned'").

Sentencing reform that was sweeping the country. *See* Final Bill Analysis & Economic Impact Statement on CS/HB 687, Florida House of Representatives, dated July 13, 1995; *see* Fla. Stat. § 944.275(4)(b)3. (1995).  Nowhere in the legislative history for the 1995 amendments is there any discussion of the amendments being needed to "clarify" subsection 4(b).  Regardless, even if the 1995 version was intended to clarify subsection 4(b), applying that "clarification" in a new statute retrospectively to McGill is the very conduct the *ex post facto* prohibition is intended to prevent.  *See Leftwich*, 148 So.3d at 83 ("[W]here a statute is ambiguous at the time a crime is committed, and the Legislature subsequently enacts a clarifying amendment that would result in a longer prison sentence, retroactive application of the clarifying amendment runs afoul of the ex post facto clause.") (citing *State v. Miranda*, 793, So.2d 1042, 1044 (Fla. 3d DCA 2001) (holding that a statutory amendment characterized by the State as a clarification could not be applied retroactively because the statute as written at the time of the crime was unclear, and retroactive application of the statute as amended would result in an increased period of incarceration)).[19]

---

[19] In *Leftwich*, the Florida Supreme Court noted "a statutory amendment may be relevant to a determination of the intent behind the previous statute."  148 So.3d at 83.  However, the Court indicated looking at a statutory amendment to determine intent would only be proper if the amendment was made in response to a controversy.  *See id.* ("[I]f the Legislature amends a statute shortly after a controversy arises with respect to the interpretation of the statute, then the amendment may be considered to be a legislative interpretation of the original statute rather than a substantive change to the statute.").  No such controversy precipitated the 1995 amendment here.

Furthermore, it is well settled that a statute should not be interpreted in a way that will yield absurd results. *See, e.g.*, *State v. Iacovone,* 660 So. 2d 1371, 1373 (Fla. 1995). Such a result is, however, exactly what the Secretary's current interpretation achieves. Under the Secretary's interpretation, inmates who committed capital offenses before January 1, 1994, and inmates who committed capital offenses after September 30, 1995, are eligible for gain-time if their sentences are commuted to a term of years. Thus, the *only* inmates who would not be eligible for gain-time are those who committed a capital offense between January 1, 1994, and September 30, 1995, and whose sentences were commuted to a term of years. As discussed above, the FDOC has identified only nine such prisoners.

This interpretation begs the question – why would the legislature carve out an exception for just those limited prisoners? Gain-time originated in Florida by an act of the legislature in 1889 and evolved through the 1970s. *Chet Kaufman, A Folly of Criminal Justice Policy-Making: The Rise and Demise of Early Release in Florida, and its Ex Post Facto Implications,* 26 Fla. St. U. L. Rev. 361, 366 (1999). "Gain-

---

Moreover, in *Leftwich* the Florida Supreme Court only discussed the statutory amendment to confirm what its analysis of the plain language of the statute showed—that inmates sentenced as habitual felony offenders could not receive provisional credits on any sentence, even one imposed before they received the habitual felony offender sentence. *See id.* at 86-88 ("Because we determine that the plain language of the statute in place at the time Leftwich committed his crimes precluded him from future awards of provisional credits on any sentence upon the entry of a habitual offender sentence, and do not apply the 1992 amendment, the ex post facto clause is not implicated."). Here, as discussed, the plain language of the 1994 version of Fla. Stat. § 944.275 does not preclude McGill from earning gain-time.

time credits and forfeitures generally were designed to reward good behavior, penalize bad behavior and provide incentives for achievement aimed toward rehabilitation." *Id.* at 366-67. There is no reason the legislature would not have wanted to incentivize inmates who committed offenses between January 1, 1994, and September 30, 1995, to behave while in prison, like all other inmates. The 1994 amendments had several purposes, including to combat habitual violent felony offenders, eliminate basic gain-time, and increase the amount of gain-time a prisoner could earn for less serious offenses. There is no indication one of those purposes was to prevent capital offenders whose sentences were commuted to a term of years from earning any gain-time at all. Because the purpose of gain-time is to encourage satisfactory behavior in prison, there is no reason to exclude those prisoners from earning gain-time. That result is simply absurd.[20]

### D.    Exhaustion

Finally, the Secretary argues McGill has not exhausted the claim raised in the petition because when the parties were before the state courts, neither the State nor

---

[20] Indeed, because no version of the Gain-Time Statute excluded capital offenders, the more reasonable interpretation of the 1995 version is that just because the severity levels did not include capital offenses did not mean that capital offenders were ineligible for gain-time. Instead, if a capital offender whose offense date was between January 1, 1994, and September 30, 1995, had his sentence commuted to a term of years, the most he could earn is 20 days of incentive gain-time because that is the most that could be earned by all prisoners prior to January 1, 1994, and the most that could be earned at the highest severity levels on or after January 1, 1994.

McGill specifically raised subsection 4(b) of Fla. Stat. § 944.275 (1994) to the state courts or argued that under that subsection McGill was entitled to gain-time credit.

Based on a calamity of errors, it is wholly unclear what version of the Gain-Time Statute the parties or the circuit court relied upon. As discussed above, when the FDOC told McGill's counsel in 2016 that he was not eligible for gain-time credit, the FDOC quoted from the **1995 version** of the statute. In McGill's state petitions, he references § 944.275(b)(2) – however, there was no (b)(2) in the 1994 version; that subsection is in the 1995 version. To make matters worse, in the circuit court's written opinion, the court purports to quote from subsection 4(b) of the 1994 version, but the quoted language references "inmate" instead of "prisoner," which was a term change that came in 1995.[21] Finally, in the Secretary's answer to the federal petition, the Secretary also quotes from the **1995 version** of the statute.[22] Doc. 16 at 22. Despite both sides and the state court appearing to have either looked at the wrong version of the Gain-Time Statute or completely overlooked subsection 4(b), the Secretary argues that to the extent McGill wants to rely on Fla. Stat. § 944.275(4)(b) here, he has not exhausted his *ex post facto* claim. The undersigned disagrees.

---

[21] It appears this error was a result of the same error in the Secretary's response in the state court, as the circuit court's opinion mirrors the Secretary's response in several respects.

[22] Indeed, in the Secretary's supplemental brief, Doc. 33, he continues to argue for the application of the 1995 version. He attempts to justify his reliance on the 1995 version by arguing "[t]here is no requirement that FDC look back to prior gain-time acts to find [McGill] gain-time." Doc. 33 at 37.

Regardless of which version, or even which provision, of the Gain-Time Statute McGill relied upon in the state courts, the substance of McGill's *ex post facto* claim here is the same as the one he made to the state courts. Specifically, as he does here, McGill argued before the circuit court: (1) that the FDOC changed its interpretation of the 1994 Rule and the Gain-Time Statute and retrospectively applied that changed interpretation to him and (2) that the Gain-Time Statute did not prohibit the FDOC from applying gain-time to his sentence. Also, the state courts were aware the Gain-Time Statute applicable to McGill is the 1994 version; thus, the state courts had a meaningful opportunity to consider and address all provisions of the statute. *See McNair v. Campbell*, 416 F.3d 1291, 1302 (11th Cir. 2005) (the exhaustion principles must be "applied with common sense and in light of the purpose underlying the exhaustion requirement: to afford state courts a meaningful opportunity to consider allegations of legal error.") (internal citations omitted). McGill's reliance on subsection 4(b) as authorizing the Secretary to award him gain-time credit, based on questioning by this Court,[23] does not change the substance of

___

[23] The Secretary appears to fault the Court for asking about the application of subsection 4(b) and, therefore, somehow creating a different habeas case than the one that was before the state courts. The Supreme Court, however, has rejected a similar argument. In *Vasquez v. Hillery*, 474 U.S. 254, 258-60 (1986), the respondent warden argued the district court "altered respondent's claim and rendered it unsuitable for federal habeas review without prior consideration by the state courts," by asking the parties for additional evidence and to present their views regarding the application of statistical probability analysis to the facts of this case." *Id.* The Supreme Court disagreed and found, instead, that "the District Court's request for further information was evidently motivated by a responsible concern that it provide meaningful federal review of the

his *ex post facto* claim. *Kelley v. Sec'y for Dept. of Corr.*, 377 F.3d 1317, 1345 (11th Cir. 2004) ("We recognize that habeas petitioners are permitted to clarify the arguments presented to the state courts on federal collateral review provided that those arguments remain unchanged in substance.").

The undersigned finds, therefore, that McGill has fairly presented his claims to the state courts and, thus, the claims are exhausted and ripe for consideration.[24] *See Baldwin v. Reese*, 541 U.S. 27, 29 (2004); *Green v. Nelson*, 595 F.3d 1245, 1254 (11th Cir. 2010) (the language in the state and federal petitions need not be identical). The state courts clearly had notice that McGill was bringing an *ex post facto* claim based on the FDOC's changed interpretation of the 1994 Rule, which is the same claim before this Court. *See Preston v. Sec'y, Fla. Dep't of Corr.*, 785 F.3d 449, 457 (11th Cir. 2015) ("The crux of the exhaustion requirement is simply that the petitioner must have put the state court on notice that he intended to raise a federal claim.").

---

constitutional claims," which "did not fundamentally alter the legal claim already considered by the state courts, and, therefore, did not require that [the prisoner] be remitted to state court for consideration of the evidence." *Id.* at 260.

[24] The Secretary also argues the question of whether subsection 4(b) of the 1994 version applies is one of state law; whereas McGill's attempt to fit under subsection 4(c) is an *ex post facto* argument. The undersigned sees no such distinction. Here, the Secretary is arguing that even if the FDOC changed its interpretation of the 1994 Rule, the Secretary has not violated the *Ex Post Facto* Clause because the Gain-Time Statute prohibits the Secretary from granting gain-time to prisoners like McGill. To address that argument, this Court must necessarily determine the meaning of § 944.275(4)(b), including determining whether it is ambiguous. *See Knuck*, 759 F.2d at 856.

Finally, McGill does not have to return to the state court "for a reconsideration of a constitutional question (already decided adversely to him) prior to resorting to the federal courts simply because the theory of a reported United States Supreme Court decision was not expressly recognized by, or even called to the attention of, the state court at the time of its earlier decision.  To so hold would unduly penalize the prisoner's interest in the ultimate disposition of his claim in a reasonably predictable fashion in deference to an oversensitive view of the desired relationship between federal and state courts." *See U.S. ex rel. Kemp v. Pate*, 359 F.2d 749, 750-51 (7th Cir. 1966); *see also Picard v. Connor*, 404 U.S. 270, 277-78 (1971) (citing *Kemp* with approval, despite reaching a different result based on the facts before it). All that is required for exhaustion is that "petitioners present their claims to the state courts such that the reasonable reader would understand each claim's particular legal basis and specific factual foundation." *Picard*, 404 U.S. at 277.

The Secretary's argument that McGill did not exhaust his *ex post facto* claim because he did not reference subsection 4(b) imposes a specificity requirement that simply does not exist when it comes to exhaustion.  *See id.*; *see also Simpson v. Carpenter*, 912 F.3d 542, 565 (10th Cir. 2018) (finding that petitioner had fairly presented a claim that the trial court erroneously excluded expert testimony regarding his PTSD diagnosis and dissociative episode from the guilt stage of trial by arguing to the state court that his PTSD was a result of a shooting, even though

in the federal habeas petition he argued the PTSD was the result of a shooting *and* lifetime trauma); *Odem v. Hopkins*, 192 F.3d 772, 776 (8th Cir. 1999) (finding petitioner exhausted ineffective assistance of counsel claim by arguing in state court that counsel was ineffective for failing to present an alternate theory of the crime, even though he argued, more specifically, in the federal petition that counsel was ineffective for failing to investigate the crime scene, failing to present a single perpetrator claim, and failing to present evidence others committed the offense).

## V.    CONCLUSION

The *ex post facto* prohibition is an "essential thread in the mantle of protection that the law affords the individual citizen," and "is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic." *Lynce*, 519 U.S. at 39 (citing *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265, (1994)).  There are "two critical elements [which] must be present for a criminal or penal law to be *ex post facto:* it must be retrospective, that is, it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it." *Weaver*, 450 U.S. at 29.  Both those elements are present here.  First, the FDOC changed its interpretation of the 1994 Rule and Gain-Time Statute in 2016.  Second, the FDOC retrospectively applied that changed interpretation to McGill and in doing so deprived him of earned and future gain-time credit.

The circuit court's determination that the FDOC did not take any gain-time away from McGill as none had been granted or awarded is simply contrary to the evidence presented and to the Supreme Court's decisions in *Weaver* and *Lynce*. Similarly, the circuit court's conclusion that the FDOC had not changed its interpretation of the 1994 Rule or the Gain-Time Statute is contrary to the evidence presented, including evidence the FDOC re-arrested capital offenders who had been released based on a reduction in their sentence by earned gain-time and evidence the FDOC removed earned gain-time after 2016 for McGill. No reasonable jurist would conclude based on the evidence presented that there was no change in interpretation, that the change was not retroactively applied, or that the changed interpretation did not adversely affect McGill. The evidence clearly supports a determination that the FDOC violated the *Ex Post Facto* Clause in refusing to grant McGill gain-time credit.

Accordingly, it is respectfully RECOMMENDED:

1.    That the petition under 28 U.S.C. § 2241, Doc. 1, be GRANTED.

2.    That the Secretary be directed to apply gain-time credits consistent with this Report, in the manner required by the Florida Statutes and Florida Department of Corrections regulations in effect at the time McGill committed his offense, and based on the Department's contemporaneous interpretation of those laws rather than on its post-2016 interpretation.

At Pensacola, Florida, this 8th day of May, 2024.

/s/ Hope Thai Cannon

**HOPE THAI CANNON**
**UNITED STATES MAGISTRATE JUDGE**

<u>NOTICE TO THE PARTIES</u>

Objections to these proposed findings and recommendations must be filed **within fourteen (14) days** of the date of the Report and Recommendation. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control.</u> An objecting party must serve a copy of its objections upon all other parties. A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.